# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 15, 2010 Session

## STATE OF TENNESSEE v. ANTHONY WHITED

### Direct Appeal from the Criminal Court for Wilson County
### No. 07-0138     David E. Durham, Judge

---

### No. M2010-00612-CCA-R3-CD - Filed December 27, 2011

---

A Wilson county jury convicted the Defendant, Anthony Whited, of second degree murder, a Class A felony. The trial court sentenced him as a violent offender to serve twenty years at 100% in the Tennessee Department of Correction. On appeal, the Defendant argues that (1) the evidence was insufficient to support his conviction; (2) the trial court erroneously ruled that the State could cross-examine the Defendant about two prior misdemeanor convictions if the Defendant chose to testify; (3) the trial court erred by allowing a witness to give evidence in the form of an opinion when (a) the State did not tender the witness as an expert and (b) the testimony was outside any area of expertise possibly attributable to the witness; (4) the trial court erroneously overruled the Defendant's motion for judgment of acquittal; (5) the trial court's jury instructions illegally shifted the burden of proof to the Defendant; and (6) the trial court erred by using the Defendant's prior convictions to determine the length of the Defendant's sentence. Following our review, we affirm the judgment of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES, Sp. J., joined. J.C. MCLIN, J., not participating.[1]

G. Jeff Cherry (on appeal), David H. Veile (at trial and on appeal) and B. F. Jack Lowery (at trial), Lebanon, Tennessee, for the appellant, Anthony Whited.

---

[1] The Honorable J.C. McLin died September 3, 2011, and did not participate in this opinion. We acknowledge his faithful service to this Court.

1

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Tom P. Johnson, District Attorney General; and Brian W. Fuller and Linda D. Walls, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

On March 13, 2007, a Wilson County grand jury indicted the Defendant, Anthony Whited, for the second degree murder of Charles Kieren. The matter was tried before a jury on July 8 through July 9, 2009.

At trial, Katherine Crouse, the victim's mother, testified that, at the time of his death, the victim was thirty-six years old and working as a truck driver. She explained that she, the victim, and another son, Curtis Kieren, lived together at 301-A Wilson Avenue in Lebanon, Tennessee. She described the residence as a two-family duplex. Her family lived in one unit of the duplex while the Defendant occupied the other unit of the same duplex. Ms. Crouse said that, although she did not "really" know the Defendant, her family and the Defendant had "[j]ust a few little arguments," such as when he called the animal shelter because their cat was on his side of the porch.

Ms. Crouse testified that on July 29, 2006, she and the victim went fishing at 5:00 a.m. and returned home between 12:00 p.m. and 1:00 p.m. They both went inside and planned to nap. Ms. Crouse took a nap and was unaware anything was wrong until a neighbor knocked on her door and told her to call the police because the victim had been stabbed. She went outside and saw the victim lying on the ground by the driveway. Ms. Crouse testified that she "could see the blood coming out of his shirt."

Thomas Wayne Hampton testified that he had lived on Martin Avenue for ten years. On July 29, 2006, he was helping his friend, Mitch Dyer, move out of his duplex on Martin Avenue. Mr. Hampton knew that the victim and the Defendant were Mr. Dyer's neighbors, but he did not know them personally. He recalled seeing the victim coming in and out of his house and cleaning out his van throughout the day. He was standing on the front porch of Mr. Dyer's house when he saw the Defendant sprinkling something around a tree in front of his house. Mr. Hampton testified that the Defendant told him and Mr. Dyer that "he was warding off the spirits." He heard the victim, who "was on his way outside," ask the Defendant what he was doing, and then the victim and the Defendant began "a hollering match." The Defendant said, "F*** you," to the victim. Mr. Hampton testified that the victim "walked up to" the Defendant and told him "to get back on [his] side." He said that "a little altercation broke out," but "no punches were thrown." Mr. Hampton thought that the Defendant pulled out a pocket knife at that point, and he and Mr. Dyer yelled at the

2

Defendant to put the knife away. The Defendant put his knife into his pocket, and the Defendant and the victim both "squared off" into "a boxing stance." Mr. Hampton testified that the Defendant kicked the victim's leg, and the victim knocked the Defendant's hat off of his head. He recalled that "maybe a couple more little punches were thrown" before the Defendant "pulled the knife back out again." Mr. Hampton said that the Defendant lunged at the victim and stabbed him in the heart once. The victim walked away and collapsed in his driveway. Mr. Hampton testified that he told the Defendant to go inside, which he did.

On cross-examination, Mr. Hampton recalled that after the Defendant stabbed the victim, the victim said, "I can get a knife, too."

Mitchell Slade Dyer testified that on July 29, 2006, he lived at 299-B Martin Avenue, next door to the duplex where the victim and the Defendant lived. He and his wife were moving out of their home that day, with the help of Thomas Hampton. Mr. Dyer recalled seeing the Defendant outside with a bag sprinkling something around the tree in the duplex's front yard. When Mr. Hampton asked what he was doing, the Defendant responded that "he was warding off evil spirits." Mr. Dyer also saw the victim cleaning out his van in his driveway. He said that the victim responded to the Defendant's statement by saying "something like, '[W]hat did you say[?]'" Mr. Dyer testified that the Defendant and the victim began "bickering back and forth," and that they were "kind of squared with each other . . . like they were squaring off maybe to fight or talking kind of harsh words to each other." He said that the victim "walked up" and the Defendant "reached [into] his pocket and clicked open a pocket knife." Mr. Dyer testified that Mr. Hampton "hollered" to the Defendant, telling him to put the knife away, and the Defendant complied. According to Mr. Dyer, the Defendant kicked the victim in the shin, and the victim lunged at the Defendant, knocking the Defendant's hat off of his head. Mr. Dyer said that they began "tussling," describing it as a "mild fist fight." He testified that they were moving across the yard, away from Mr. Dyer's house, until the victim turned around and began walking back toward the driveway. Mr. Dyer said that the victim was bleeding, but he managed to walk several steps before he stopped and laid down. He testified that, while Mr. Hampton stayed with the victim, he went to the victim's door to get his mother to come outside. Mr. Dyer recalled that Mr. Hampton told the Defendant to go inside his house, and the Defendant complied.

On cross-examination, Mr. Dyer testified that he saw the victim's brother break a window and say, "'I'm going to kill the mother f***er."

Christian Dyer, Mitchell Dyer's wife, testified that on July 29, 2006, she and her husband were moving out of their home with the help of Thomas Hampton. She said that they lived next door to the duplex where the victim and the Defendant lived. Mrs. Dyer testified that she saw the Defendant sprinkling something around a tree and that her husband asked him what he was doing. The Defendant responded that he was sprinkling dust to ward

3

off evil spirits. Mrs. Dyer saw the victim come outside and heard him ask the Defendant what he was doing. She did not recall the Defendant's response to the victim. Mrs. Dyer testified that the Defendant pulled out a knife but put it away at Mr. Hampton's request. She said that as the altercation escalated, the men moved across the front yard. She called 911 as soon as the altercation began, so she was already on the phone with the dispatcher when she saw the victim turn around, walk back toward the driveway, and collapse. She said that the victim was "real pale," had a "stunned look" on his face, and he was bleeding in the area underneath his rib cage. She stayed with the victim until the police and medical personnel arrived. Mrs. Dyer said that because her focus was on the victim she was unaware of the Defendant's actions after the victim collapsed.

Lebanon Police Detective Eddie Brown testified that he responded to a call from 301 Martin Avenue in Lebanon, Tennessee, on July 29, 2006. The police received the call at 1:23 p.m., and he arrived at the scene at 1:27 p.m. When he arrived, paramedics were treating the victim, and patrol officers had detained the Defendant in a patrol car. He advised the Defendant of his *Miranda* rights, and the Defendant signed a waiver form. Detective Brown testified that the Defendant told him that he had "been having a feud [with his neighbors] over the last two or three weeks" about the neighbors' cats. The Defendant told the detective that he was taking his trash out when the victim yelled at him and approached him. He further said that the victim pushed him, so he warned the victim "not to put his hands on him anymore." The victim "took a swing" at the Defendant, knocking off his hat, and the Defendant warned the victim not to touch him again or he would hurt him. The Defendant told Detective Brown that he pulled out his knife, and the victim "leaned towards him or [went] after him and the knife stuck him in the chest." The Defendant also gave the following written statement, which Detective Brown read into evidence:

> [H]ave had ongoing dispute with neighbors. Landlord notified. Refused to get involved. Today going outside to trash can. [The victim] started hollering at me. Crossed over to my front yard, still hollering. Put his hand . . . [on] me. At this time, I informed him not to touch me again. He then took a swing at me. I received a glancing blow to the . . . [left] side of my head, at which time I informed him that if he did it again, I would not stand for it. He then came at me again at which time I pulled knife. One of [the] neighbors . . . (Thomas) . . . said [to] put knife away. [The victim] then jumped at me and stepped in to knife. Knife struck [the victim] in right upper torso. I then went into house, locked door and called 911 for ambulance and police. The [victim's] brother, Curtis, came on front porch and broke bay window shortly after police arrived.

Detective Brown testified that the Defendant described the knife he used as "a black Smith & Wesson lock blade pocket knife" and told him it was inside his home on a table in the

4

living room. The Defendant signed a consent form to allow police to search his home for the knife. Detective Brown collected the knife from the Defendant's unit and sent it to the Tennessee Bureau of Investigation for testing. Detective Brown testified that the Defendant appeared calm and did not have any bruises, cuts, or abrasions on his person.

The parties stipulated that testing revealed that the victim's blood was on the knife.

Dr. Alex Brent Fruin testified that he treated the victim at the University Medical Center on July 29, 2006. He testified that the victim had a stab wound to his right lower chest and had no signs of life upon entry to the emergency room. Dr. Fruin performed an emergency thoracotomy and saw that the right ventricle of the victim's heart was damaged. Dr. Fruin testified that he repaired the hole in the victim's heart and gave the victim blood transfusions. He said that the victim regained blood pressure but never regained brain activity. Dr. Fruin testified that the staff documented that the victim had brain death, and the victim became an organ donor. Dr. Fruin opined that "significant direct force" was required to penetrate the heart because of the framework protecting the heart from external damage.

Dr. Amy McMaster, a forensic pathologist, testified that she performed the victim's autopsy. She testified that in her external examination, she noted large sutured incisions from the victim's emergency surgery and subsequent organ donation. In her internal examination, she noted the absence of several organs that had been donated and a stab wound to the right ventricle of the heart that showed evidence of medical intervention. Dr. McMaster testified that the cause of the victim's death was a stab wound to the chest and the manner of death was homicide.

On cross-examination, Dr. McMaster testified that the stab wound entrance on the victim's chest was obscured by the medical intervention and that she could not determine the exact location of the entrance wound. She said that her office did not perform a toxicology test on the blood drawn from the victim, and she explained that the victim would not have had any of his own blood remaining due to the transfusions he received.

Following the close of proof and deliberations, the jury convicted the Defendant of second degree murder. The trial court sentenced the Defendant as a violent offender to twenty years in the Tennessee Department of Correction.

## II. Analysis
### A. Sufficiency of the Evidence

The Defendant argues that the evidence was insufficient to support his conviction for second degree murder. He contends that the evidence substantiates his claim of self-defense,

5

and, alternatively, that the evidence at most supports a conviction for voluntary manslaughter.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) (quoting *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view

6

of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

Second degree murder is "[a] knowing killing of another." *See* T.C.A. § 39-13-210(a)(1) (2010). A knowing act requires one to be "aware of the nature of the conduct" and "aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2010). "[A] result-of-conduct crime does not require as an element that an actor engage in a specified course of conduct to accomplish the specified result." *State v. Ducker*, 27 S.W.3d 889, 896 (Tenn. 2000). The claim of self-defense is essentially a fact question for the jury. *See State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); *State v. Ivy*, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). Of significance, voluntary manslaughter requires proof that the defendant intentionally or knowingly killed another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner. *See* T.C.A. § 39-13-211 (2010).

After reviewing the evidence in the light most favorable to the State, we conclude that the evidence was sufficient to support the Defendant's conviction for second degree murder. The evidence established that the Defendant had some conflict with the victim over the victim's pets. On the day in question, the victim asked the Defendant what he was doing in the yard, a yard shared by the victim and the Defendant as tenants of a duplex, which led to a verbal argument. The eyewitnesses testified that the Defendant pulled out a knife and put the knife away before the verbal argument escalated into a physical altercation. The witnesses agreed that the physical altercation was mild and that it was begun by the Defendant, who kicked the victim. The witnesses also agreed that the Defendant and victim were moving across the yard, with the Defendant backing away until he pulled out his knife again and stabbed the victim in his heart. The stab wound was in an area protected by the rib cage which required significant force in order to reach and penetrate the heart in the manner it did. One witness testified that the Defendant lunged at the victim with the knife and thereafter the victim collapsed near the driveway. The record reflects that the victim was unarmed at all times. Therefore, the evidence was sufficient to establish that the Defendant knowingly killed the victim.

Upon review, we note that the jury was instructed on voluntary manslaughter as a lesser-included offense of second degree murder. The jury was also instructed on self-defense. From the evidence, the jury could have rationally found that the Defendant's action in stabbing the victim was excessive and unnecessary for self-defense and that the

Defendant's use of deadly force was not founded on reasonable grounds. Whether adequate provocation exists so as to support a conviction for voluntary manslaughter is a question for the jury. *See State v. Johnson*, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995). In finding the defendant guilty of second degree murder, the jury obviously rejected the theory that the Defendant was adequately provoked to act in an irrational manner by stabbing and killing the victim. As previously noted, the jury, as the trier of fact, determines the weight and value of the evidence and resolves all conflicts in the evidence. *See Bland*, 958 S.W.2d at 659. The jury, as was their prerogative, chose not to credit the Defendant's theory that he stabbed the victim while in a state of passion because he was adequately provoked, and we will not second-guess the factual determinations of the jury. Accordingly, the Defendant is not entitled to relief on this issue.

## B. Prior Convictions

The Defendant contends that the trial court erred by ruling prior to trial that the State could cross-examine the Defendant, should he have chosen to testify, about two misdemeanor theft convictions. Specifically, the Defendant argues that the trial court never considered the prejudicial effect of the prior convictions, thus violating Tennessee Rule of Evidence 609.

This Court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. *See State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). Rule 609 of the Tennessee Rules of Evidence permits the accused's credibility to be impeached by prior criminal convictions on cross-examination if certain conditions and procedures are satisfied. The conviction must be for a crime (1) punishable by death or incarceration in excess of one year, or (2) involving dishonesty or false statement. Tenn. R. Evid. 609(a)(2). Generally, convictions that are ten years old or more cannot be used for purposes of impeachment. Tenn. R. Evid. 609(b). The State is also required to give reasonable written notice prior to trial of the particular convictions it intends to use to impeach the accused. Tenn. R. Evid. 609(a)(3). Before permitting the use of a prior conviction, the trial court must find that the probative value of the conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. *Id.* The trial court shall rule on the admissibility of the prior conviction before the accused testifies. *Id.* If the court rules that the prior conviction is admissible to impeach, there is no requirement that the accused testify at trial in order to later challenge the court's ruling on the admissibility of the prior conviction. *Id.*

The mere fact that a prior conviction of the accused is identical or similar in nature to the offense for which the accused is being tried does not, as a matter of law, bar the use of the conviction to impeach the accused as a witness. *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997) (citations omitted). However, "[w]hen an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger

8

that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that, since the defendant committed a similar offense, he or she is probably guilty of the offense charged." *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999) (citations omitted). Accordingly, trial courts should engage in a two-prong analysis when determining if the probative value of the impeaching conviction is outweighed by its prejudicial effect. *Id.* Trial courts are required to expressly (1) "analyze the relevance the impeaching conviction has to the issue of credibility," as well as (2) "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." *Id.* (citations omitted). If the trial court fails to engage in an explicit analysis under *Mixon* and Rule 609, then "the court's decision to admit or exclude a prior conviction is not entitled to deference by the reviewing court . . . [, and] we must independently determine the admissibility of the prior impeaching conviction based on the evidence presented." *State v. Lankford*, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008).

Prior to trial, the State notified the Defendant of two misdemeanor theft convictions it intended to use for impeachment purposes, should the Defendant testify. In a pre-trial hearing, the trial court noted that prior convictions are prejudicial against any witness and ruled that the State could cross-examine the Defendant about the prior convictions if the Defendant testified because "convictions for theft are always probative of credibility." The trial court further stated that credibility was an issue in cases where the Defendant alleged self-defense and that the trial court would give a curative instruction to the jury "to the effect that they are to consider these convictions only as to [the Defendant's] credibility on the stand and for no other purpose." At trial, the Defendant chose not to testify.

Because the trial court did not explicitly weigh the prejudicial effect against the probative value, the trial court's decision is not entitled to deference. *See Lankford*, 298 S.W.3d at 182. Therefore, we must independently determine the admissibility of the Defendant's convictions for impeachment purposes. *Id.* First, the Defendant's misdemeanor theft convictions were relevant to his credibility had he chosen to testify because they were crimes of dishonesty. This Court has previously held that theft-related offenses are probative of a defendant's credibility because they are crimes of dishonesty. *See State v. Addison*, 973 S.W.2d 260, 268 (Tenn. Crim. App. 1997) (citing *State v. Crane*, 780 S.W.2d 375, 377 (Tenn. Crim. App. 1989); *State v. Fluellen*, 626 S.W.2d 299, 300 (Tenn. Crim. App. 1981); *State v. Holtcamp*, 614 S.W.2d 389, 394 (Tenn. Crim. App. 1980)). The trial court in this case determined that the Defendant's credibility would be an issue if he chose to testify because he was claiming self-defense, and we agree. Secondly, because the Defendant was charged with second degree murder, there was no similarity between the indicted offense and the impeaching convictions; therefore, there was little, if any, danger that the jury would use the impeaching convictions as propensity evidence. We conclude that the probative value of the impeaching convictions on the Defendant's credibility was not outweighed by danger of unfair prejudice.

Although the trial court erred in not determining the similarity between the crime on trial and the prior felony conviction and not weighing the probative value of the evidence against its prejudicial effect, we conclude that the trial court did not err in admitting the Defendant's prior theft convictions for impeachment purposes. However, we must still consider whether the trial court's procedural error more probably than not affected the judgment against the Defendant. *See Lankford*, 298 S.W.3d at 182. Additionally, the Defendant also claims that the trial court's ruling violated his due process right to present a defense.

Taking the Defendant's due process violation claim first, we conclude that the Defendant's argument is without merit because he remained free to testify despite the trial court's ruling. As the Tennessee Supreme Court noted in *Galmore*, an erroneous ruling under Rule 609 "does not involve the deprivation of a fundamental constitutional right." *State v. Galmore*, 994 S.W.2d 120, 125 n. 3 (Tenn. 1999). We further conclude that the trial court's procedural error was harmless because the Defendant has failed to show any proof that would establish that he was prejudiced by the trial court's error. Therefore, the Defendant is without relief as to this issue.

## C. Expert Testimony

The Defendant alleges two errors regarding Dr. Fruin's testimony. First, he argues that the State did not tender Dr. Fruin as an expert. Secondly, he claims that the trial court allowed Dr. Fruin to give an opinion that was outside any area of expertise possibly attributable to the witness. The State responds that the Defendant has waived these issues, and we agree.

The record reveals that the Defendant stipulated to Dr. Fruin's qualifications. The Defendant objected to Dr. Fruin's testimony, apparently on the ground of relevancy, asking whether it was necessary "to go in to this big in depth synopsis on this." The Defendant never objected to Dr. Fruin's characterization of the amount of force required to puncture the victim's heart. By failing to make a contemporaneous objection to testimony, a Defendant waives appellate consideration of the issue. *See State v. Schmeiderer*, 319 S.W.3d 607, 625 (Tenn. 2010) (citing *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001)). Appellate relief is not required when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). His general objection to the breadth of Dr. Fruin's testimony was insufficient to preserve the issue for appeal, and thus, he has waived this argument. *See Alder*, 71 S.W.3d at 302.

## D. Motion for Judgment of Acquittal

The Defendant alleges that the trial court erred by overruling the Defendant's motion for judgment of acquittal. However, as the standard for reviewing a trial court's ruling on such a motion is the same as the standard for reviewing sufficiency of the evidence, and as we have determined that the evidence was sufficient to sustain the Defendant's conviction, we conclude that the trial court did not err by overruling the motion. *See State v. Peat*, 790 S.W.2d 547, 549 (Tenn. Crim. App. 1990).

### E. Jury Instructions

The Defendant argues that the trial court erred by giving the jury instructions that illegally shifted the burden of proof to the Defendant. Specifically, he contends that the instruction, "If you unanimously find beyond a reasonable doubt the Defendant not guilty to the more serious indicted offense, you then will consider the Defendant's guilt or innocence of the lesser included offenses in order," illegally required the Defendant to prove his innocence. The State responds that the jury instructions, taken as a whole, correctly stated the law.

Under the United States and Tennessee Constitutions, a defendant has a right to trial by jury. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). A defendant also has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions. *Id.* In evaluating claims of error in jury instructions, courts must remember that "'jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning.'" *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998) (quoting *Boyde v. California*, 494 U.S. 370, 380-381 (1990)). Therefore, we review each jury charge to determine if it fairly defined the legal issues involved and did not mislead the jury. *See State v. Hall*, 958 S.W.2d 679, 696 (Tenn. 1997).

In this case, the trial court gave the jury the following instructions about the burden of proof:

> The law presumes that the Defendant is innocent of the charge against him. This presumption remains with the Defendant throughout every stage of the trial[,] and it is not overcome unless from all of the evidence in the case you are convinced beyond a reasonable doubt that the Defendant is guilty.

> The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt[,] and this burden never shifts but remains on the State throughout the trial of the case. The Defendant is not required to prove his innocence.

11

The State must have proven beyond a reasonable doubt all of the elements of the crime charged and that it was committed before the finding and returning of the indictment in this case.

. . . .

If you unanimously find beyond a reasonable doubt the Defendant not guilty to the more serious indicted offense, you then will consider the Defendant's guilt or innocence of the lesser included offense or offenses.

The Defendant argues that the language, "If you unanimously find beyond a reasonable doubt the Defendant not guilty," illegally shifted the burden of proof to the Defendant to prove that he was innocent. The State counters that the language is similar to Tennessee Pattern Jury Instruction 41.01: "If you unanimously find the defendant not guilty of that offense, or have a reasonable doubt of the defendant's guilt of that offense, you shall then proceed to consider whether or not the defendant is guilty of the next lesser included offense in order from greatest to least within that *[indictment][count]*." The difference between the pattern jury instruction and the instruction here is the addition of the phrase, "beyond a reasonable doubt." In support of his argument, the Defendant cites *Lee v. Taylor*, 566 F. Supp. 28 (N.D. Ohio, 1983). In that case, the district court held that "[t]he jury instructions requiring [the defendant] to prove emotional stress beyond a reasonable doubt had the effect of relieving the state of its burden to prove every element of the offense of aggravated murder beyond a reasonable doubt." *Id.* at 30 . In the case *sub judice*, however, the trial court explicitly stated in the jury instructions that the state had the burden of proving every element of the offense and that the burden never shifted to the Defendant.

The portion of the jury instructions with which the Defendant takes issue detailed how the jury was to proceed with considering lesser-included offenses and required the jury to unanimously acquit the Defendant before considering the lesser-included offenses. The Tennessee Supreme Court has determined that acquittal-first jury instructions do not offend a defendant's right to trial by jury under the Tennessee Constitution. *See State v. Davis*, 266 S.W.3d 896, 905 (Tenn. 2008). The *Davis* Court held that

> while a defendant is entitled by our constitution to have the jury charged on all offenses encompassed within the indictment and supported by the proof, our constitution does not go so far as to mandate the order in which those offenses are considered. Our constitution also does not prohibit the requirement that a jury first reach a unanimous verdict of acquittal with respect to a greater offense before it proceeds to consider a defendant's guilt of a lesser-included offense.

12

*Id.* In our view, the additional phrase, "beyond a reasonable doubt," in that portion of the jury instructions was not fatal to the jury instructions as a whole. If including the phrase was an error, the error was harmless because the trial court accurately instructed the jury as to the State's burden of proving the Defendant's guilt and because the jury did not need to consider acquitting the Defendant of second degree murder because it found him guilty beyond a reasonable doubt. Therefore, the Defendant is without relief as to this issue.

### E. Sentencing

For his final issue, the Defendant contends that the trial court erred in enhancing his sentence based in part upon prior convictions for which the State did not prove that the Defendant either was represented by counsel or had executed a valid waiver of counsel when he was convicted of each offense. The State responds that the Defendant waived this argument by failing to object prior to trial when the State gave notice of convictions it intended to submit for sentence enhancement nor during the sentencing hearing. We agree with the State.

Appellate relief is not required when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). "This Court is extremely hesitant to put a trial court in error where its alleged shortcoming has not been the subject of a contemporaneous objection." *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Another panel of this Court has held that a defendant waived the exact argument presented in this case by failing to object at the sentencing hearing. *See State v. Pierre Jackson*, No. W2006-02127-CCA-R3-CD, 2008 WL 2053652, at *5 (Tenn. Crim. App., at Jackson, May 12, 2008). The Defendant had the opportunity to present this argument prior to trial and at the sentencing hearing yet failed to do so. Therefore, we conclude that he has waived appellate review of this argument.

### III. Conclusion

Based on the foregoing reasons, we affirm the judgment of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE